1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AQUIOR ALFONSO FIGUEROA,

                    Petitioner,

          v.

TIM VIRGA, Warden,

                    Respondent.
_____/

No. C 11-1072 PJH

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS**

          Before the court is the petition for writ of habeas corpus pursuant to 28 U.S.C. §
2254, filed by state prisoner, Aquior Alfonso Figueroa ("Figueroa").  Having reviewed the
parties' papers, the record, and having carefully considered their arguments and the
relevant legal authorities, the court DENIES the petition.

**BACKGROUND**

**A.     Procedural Background**

          In 2007, an Alameda County jury convicted Figueroa of one count of second degree
murder under California Penal Code § 187(a), and of one count of being a felon in
possession of a firearm in violation of California Penal Code § 12021(a)(1).  Additionally,
regarding the murder charge, the jury found true several enhancement allegations,
including that Figueroa was armed with and personally discharged a firearm during the
offense; that he committed the offense while an active member of the Border Brothers
street gang; and that he committed the offense for the benefit of and at the direction of a
criminal street gang.  Regarding the weapons charge, the jury also found true the

United States District Court

For the Northern District of California

1   ehnancement allegation that Figueroa committed the offense for the benefit of and at the

2   direction of a criminal street gang.

3          On September 21, 2007, the court sentenced Figueroa to fifteen years to life on the

4   second degree murder conviction, along with an additional one-year sentence stayed for

5   the gun use finding, ten years stayed for the gang enhancements, and twenty-five years to

6   life for the enhancement for personally and intentionally discharging a firearm and

7   proximately causing great bodily injury.  As for count two, the firearm conviction, the court

8   sentenced Figueroa to three years, along with an aggravated term of four years for the

9   gang enhancements, both to run concurrently with the sentence on count one.  In sum,

10  Figueroa received an aggregate sentence of forty years to life.

11         Figueroa subsequently filed a direct appeal with the state appellate courts.  On

12  October 8, 2009, the California Court of Appeal affirmed his conviction, and on December

13  23, 2009, the California Supreme Court denied review.  Figueroa filed the instant federal

14  habeas petition on March 8, 2011.

15  **B.     Factual Background**

16         Figueroa's conviction stems from the following facts, which the state court noted as

17  follows:

18         On September 3, 2006, Oakland Police Sergeant Eric Lewis was
           driving in his patrol car on Fruitvale Avenue heading toward Interstate 580.
19         His attention was drawn to two automobiles approaching Fruitvale that
           appeared to be driving in tandem. The lead car was a green Buick Regal and
20         the second car was a BMW. There were four Hispanic males in each car, all
           wearing white t-shirts. Lewis ran the license plate number of the BMW and it
21         came back clean.

22         About seven minutes later, Lewis received a radio broadcast of a
           shooting and proceeded to the Kragen Auto Parts store at Fruitvale Avenue
23         and Foothill Boulevard. He saw a man, later identified as Jorge Sisneros,
           lying on his back near the store entrance, with hundreds of people standing
24         around. Lewis later identified the two cars he had seen earlier in a surveillance
           tape provided by Kragen.
25
           [Eyewitnesses] Amy Cobos and her husband drove into the Kragen
26         parking lot shortly before 12:00 noon on September 3, 2006. Just as they
           parked their car in front of the store, Cobos heard sounds like firecrackers
27         exploding. Her husband yelled at her, "Get down, they're shooting." She
           looked over her right shoulder to see where the noise was coming from. She
28

United States District Court

For the Northern District of California

saw a Latino male shooting at another Latino male. The two were about eight or nine feet apart and the man who was shot fell backwards over a small fence. The other man kept walking closer to him and shooting at him until he was standing over him. He continued shooting down at the man and then stopped. Cobos did not know where the shooter went after he stopped shooting. Cobos estimated that she could see the shooter for a minute and a half to two minutes. She was focused on the shooter's face because of the "very cold" look he had in his eyes. A couple of weeks before the trial, Sergeant Tim Nolan of the Oakland Police Department showed Cobos at least 13 or 14 photographs to see if she could identify the shooter.[1] She identified a photograph of Hector Sanchez as the shooter at that time, and identified his photograph again in court.

Ms. Cobos' husband identified Figueroa as the driver of a green sedan that drove into the entrance of the Kragen parking lot. As he was parking his car, Mr. Cobos heard two "pops." He immediately got out of his car to see where the noise came from. When he looked in the direction of the sounds, he saw the green car. He observed a male inside the passenger-side rear compartment of the car with his hand out the window, and he saw the victim staggering backwards. The shooter was about three feet away from the victim. Mr. Cobos yelled for his wife to get down. He saw the victim stagger backwards over a small, two-foot-high fence. As the victim was falling backward, the shooter came out of the vehicle with his right hand extended, and began walking toward the victim. The shooter continued walking until he was standing over the supine victim, with his legs apart. He kept shooting down at the victim until he "finished off his gun." Mr. Cobos could see fire coming out of the gun and dust coming off of the ground. When he was finished, the shooter turned around and got back into the green car. The car's tires "screeched" as the car left the scene, heading north on Fruitvale in the direction of Interstate 580.

Mr. Cobos went over to the victim, Jorge Sisneros, put his arm under the victim's neck, and asked him, "Who did this to you?" Sisneros answered, "The dude in the BMW." Sisneros then told Mr. Cobos that he was dying and closed his eyes. By the time the paramedics arrived a few minutes later, Sisneros had already died.

Sisneros died from multiple gunshot wounds. He was struck or grazed by 15 bullets. Evidence of a total of 22 shots was retrieved from the scene, eight from a .22-caliber firearm that could have been either a handgun or a rifle and 14 from a single .30-caliber carbine.

Eyewitnesses gave the police license plate numbers and descriptions of the cars. The Buick was registered to [Figueroa]. He was arrested on September 26, 2006, while driving the Buick.

There was evidence at trial that the victim, Sisneros, was a member of a Latino street gang, the Nortenos, and that Figueroa was a member of or associated with the

---

[1]As the state appellate court correctly notes subsequently in its order, Nolan actually showed Ms. Cobos nineteen photographs.

Border Brothers street gang.  The California Court of Appeal noted the following gang testimony that was elicited at Figueroa's trial:

> The prosecution's gang expert, Eugene Guerrero, testified as to the history, structure, membership, and activities of the Border Brothers gang. According to Guerrero, the gang's rivals were the Norteños and associated gangs. A Norteño-affiliated gang claims the area surrounding the intersection of Fruitvale Boulevard and Foothill Avenue as its "turf."
>
> Guerrero opined that [Figueroa] was a member of the Border Brothers gang on the basis of the following evidence: (1) after [Figueroa] was arrested, police found a t-shirt in his bedroom memorializing a Border Brothers member named Vicente "No-No" Gomez Zepeda, who had been killed; (2) a 1998 assault victim, Mark Dominic, identified Eduardo Pena, a Border Brothers gang member, and [Figueroa], as his assailants; (3) when [Figueroa] and Pena were contacted by police about the Dominic assault they were in the company of another self-admitted Border Brothers gang member; (4) [Figueroa] had previously been arrested while driving a vehicle containing a firearm; (5) [Figueroa] was present on April 30, 2006 at Highland Hospital with two other Border Brothers gang members after another gang member was brought there by private automobile with gunshot wounds; (6) [Figueroa] was present on June 13, 2006 at the funeral of Vicente "No-No" Gomez Zepeda, at which [Figueroa] and others were flashing gang signs; (7) the person Amy Cobos identified as the shooter of Jorge Sisneros, Hector Sanchez, was a self-admitted Border Brothers gang member;[2] and (8) Alejandre Chaidez, who was stopped driving the BMW used in the shooting of Sisneros, was a self-admitted Border Brothers gang member.
>
> In Guerrero's opinion, the present offenses - the Sisneros shooting and [Figueroa's] possession of the firearm - were committed for the benefit and at the direction of the Border Brothers gang to gain and maintain respect for the gang and its reputation.

At trial, Figueroa put on the following defense, as noted by the state appellate court:

> Defense gang expert, Marco Arvizo, opined that there are many occasions in which nongang members can and do flash gang signs and wear gang colors and that someone who flashes gang signs is not necessarily admitting they are a gang member.
>
> [Figueroa] testified that he was 25 years old. In September 2006, he lived in San Leandro with his mother, father, and sister. Hector Sanchez was his friend. At the time of the Sisneros shooting, [Figueroa] owned a two-toned, green-and-gray Buick sedan. Since many of his friends did not have cars, he would be asked "all the time" to give them rides. On one such occasion, the morning of September 3, 2006, Hector Sanchez called him and asked him to go to 98th Avenue and Bancroft Avenue in Oakland to give a ride to some of Hector's friends. Because he had given rides to friends many times before,

---

[2] The state court noted that Sanchez was subsequently shot and killed on September 16, 2006, less than two weeks after Sisneros was murdered.

4

United States District Court

For the Northern District of California

[Figueroa] agreed and drove to 98th and Bancroft. When he arrived, he found a BMW already there. Four people entered his car. Some others were already sitting in the BMW. Hector was not there and [Figueroa] did not see Hector that day.

[Figueroa] denied that he was a member of the Border Brothers gang and, when asked what he thought he was going to do when he picked people up at 98th and Bancroft, [Figueroa] stated, "I believed I was just going to drop them off." [Figueroa] followed the BMW at all times. Nobody told him exactly where they were going. He saw no weapons on any of the occupants and had no weapon himself. As he was driving, there was no discussion among the car's occupants of their intention to shoot anyone and [Figueroa] had no idea that a shooting was contemplated by them. He did not have "even the wildest idea that a shooting was going to take place." As they approached Foothill and Fruitvale, the BMW pulled over and [Figueroa] pulled in behind it. Without warning, a number of people "hopped" out of his car and "a whole lot of shooting" suddenly erupted. [Figueroa] was "in shock" and "paralyzed." He ducked down, uncertain whether the shooting was directed at him. When his passengers returned to the car, he drove off. He knew that the people he was with had shot somebody. After [Figueroa] dropped his passengers off at 98th and Bancroft, he called Hector, and asked him why he would put him in such a situation, and told Hector never to do that again. [Figueroa] was "highly upset" about what had happened.

[Figueroa] did nothing to change his appearance or the appearance of his car after the shooting. He did not call the police because he was scared of what would happen to his family if he was arrested. After being arrested, he told the police what had happened and described the people who were with him and gave police the nicknames of two of them. He did not know their real names.

[Figueroa] denied that the 1998 assault incident had any relationship to gangs. He testified that although he attended the funeral of a gang member and flashed gang signs at the funeral, he did so only to show respect for the man that passed away and not because he was a gang member.

## ISSUE

Figueroa raises the following claim:

(1) his Fourteenth Amendment due process rights were violated when the trial court admitted into evidence an eyewitness identification of the person whom Figueroa aided and abetted in committing the murder because the identification was the product of an unnecessarily suggestive and unreliable identification procedure.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's

5

United States District Court

For the Northern District of California

1  adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

2  unreasonable application of, clearly established Federal law, as determined by the

3  Supreme Court of the United States; or (2) resulted in a decision that was based on an

4  unreasonable determination of the facts in light of the evidence presented in the State court

5  proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to

6  mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09, (2000),

7  while the second prong applies to decisions based on factual determinations, *Miller–El v.*

8  *Cockrell*, 537 U.S. 322, 340 (2003).

9      A state court decision is "contrary to" Supreme Court authority, that is, falls under

10  the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to

11  that reached by [the Supreme] Court on a question of law or if the state court decides a

12  case differently than [the Supreme] Court has on a set of materially indistinguishable facts."

13  *Williams (Terry)*, 529 U.S. at 412–13.  A state court decision is an "unreasonable

14  application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it

15  correctly identifies the governing legal principle from the Supreme Court's decisions but

16  "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The

17  federal court on habeas review may not issue the writ "simply because that court concludes

18  in its independent judgment that the relevant state-court decision applied clearly

19  established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must

20  be "objectively unreasonable" to support granting the writ. *Id.* at 409.

21      A state court's determination that a claim lacks merit precludes federal habeas relief

22  so long as "fairminded jurists could disagree" on the correctness of the state court's

23  decision. *Harrington v. Richter*, 131 S.Ct. 770, 786-87 (2011) (citing *Yarborough v.*

24  *Alvarado*, 541 U.S. 652, 664 (2004)).  "[E]valuating whether a rule application [i]s

25  unreasonable requires considering the rule's specificity. The more general the rule, the

26  more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* "As a

27  condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must

28

United States District Court

For the Northern District of California

1   show that the state court's ruling on the claim being presented in federal court was so

2   lacking in justification that there was an error well understood and comprehended in

3   existing law beyond any possibility for fairminded disagreement." *Id.*

4       Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

5   determination will not be overturned on factual grounds unless objectively unreasonable in

6   light of the evidence presented in the state-court proceeding." *Miller–El*, 537 U.S. at 340.

7       Review under § 2254(d)(1) is limited to the record that was before the state court

8   that adjudicated the claim on the merits. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

9                           **DISCUSSION**

10      Figueroa argues that the state appellate court's affirmance of the trial court's

11  admission of eyewitness Amy Cobos' ("Ms. Cobos") pretrial identification of Hector

12  Sanchez ("Sanchez") as the shooter at trial violated his due process rights because the

13  identification was the product of an unnecessarily suggestive and unreliable identification

14  procedure.

15  **A.    State Court Proceedings**

16      Prior to trial, Figueroa moved to suppress evidence of Ms. Cobos' pretrial

17  identification of Sanchez.  In conjunction with the motion, the trial court entertained

18  argument from the parties and also heard testimony from Oakland Police Department

19  ("OPD") Sergeant Robert Nolan.  R.T. 24-50.  As the California Court of Appeal noted, that

20  testimony revealed:

21          On May 24, 2007, Sergeant Robert Nolan of the Oakland Police
        Department met with Amy Cobos at the police station to see if she could
22      identify the shooter from a photographic lineup. Nolan instructed Cobos not to
        guess or conclude anything from the fact that he was showing her the
23      photographs. He further informed her that people's complexions could appear
        different in the photographs and that their hairstyles and facial hair could change.
24      Although the police department has a printed admonition form that officers can read
        to witnesses before they are shown a photo lineup, Nolan did not read that form to
25      Cobos and could not restate verbatim the admonitions he gave Cobos.

26          Nolan showed Cobos a total of 19 photographs. The first 18
        photographs were presented to Cobos in three one-page lineups displaying
27      six equal-sized photographs that were laser-printed on each page. After
        Cobos looked at each of the lineup pages for some time, she told Nolan she

28

                                    7

could not recognize anyone and Nolan would hand her the next page. When Cobos had finished looking at the third lineup without recognizing anyone, Nolan took out a [fourth] page containing a single photograph, which was larger than the others, and showed it to Cobos. It was a photograph of Hector Sanchez. Her first words after looking at it were, "I'm gonna say that's him." She picked the photograph up, kept looking at it, and seemed to shake her head while saying, "That's him. That's him." She told Nolan that the man in the photograph was the shooter.

Nolan testified that he had intended to make another photographic lineup page, but the copy machine had problems. He decided to show Cobos single photographs from his case packet, but she made an identification of the first photograph he showed her. Although Nolan had two more photographs to show Cobos, he decided not to show them because she had only seen one shooter and had selected the photograph of the man she believed he was. Through oversight, Nolan did not have Cobos date and sign the photograph she had identified.

Regarding Sanchez's photograph, the state appellate court additionally noted that:

Printed text appeared immediately beneath Sanchez's photograph listing Sanchez's 'PFN' number (a unique number assigned to arrestees), his first and last names, and a booking date in 2002. Nolan had also handwritten Sanchez's nickname, 'Lechuga' below the printed text. When Cobos first saw the photograph, the writing was covered with another piece of paper. Nolan testified that Cobos nonetheless might have been able to see the writing when she picked the page up to take a closer look at the photograph.

In support of his motion to suppress, Figueroa argued that the procedure employed by Nolan was impermissibly suggestive, and constituted a "one-person show-up."  R.T. 149-150.  Based on its evaluation of the requisite factors set forth in California cases regarding single photo show-ups, the trial court ruled that the procedure employed by Nolan was not unnecessarily suggestive.  R.T. 151-52.

In favor of admissibility, the trial court found that Ms. Cobos appeared to have had "a very good opportunity in broad daylight to – directly facing the shooter, to have identified him at the time."  R.T. 151.  It noted that Ms. Cobos testified that she "was focused exclusively [on the shooter]," and even had "a tunnel vision-type of a view of the shooter's faith."  R.T. 152.  It further noted that she expressed "a high degree of certainty" that Sanchez was the shooter both at the time she identified him on May 24, 2007, and at the time she testified on July 9, 2007.  *Id.*  The trial court noted that the delay between the crime and identification constituted a factor against admissibility, R.T. 151, but ultimately

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   found that under the totality of the circumstances, the process was not unduly suggestive.

2   R.T. 152.

3        On direct appeal, the California Court of Appeal denied Figueroa's claim that his due

4   process rights had been violated by the trial court's admission of the pretrial identification

5   on the merits and on standing grounds.  First, the state court held that under California law,

6   Figueroa lacked standing to object to an eyewitness' identification of a third person,

7   Sanchez, as the suspected shooter.  Alternatively, even assuming Figueroa had standing,

8   the state court held that under the totality of the circumstances, the identification was not

9   unconstitutional under California or United States Supreme Court law.  This court discusses

10  the state court's decision in more detail below in its analysis of Figueroa's claim.

11  **B.    Legal Standards**

12       A state court's evidentiary ruling is not subject to federal habeas review unless the

13  ruling violates federal law, either by infringing upon a specific federal constitutional or

14  statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed

15  by due process.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*,

16  926 F.2d 918, 919-20 (9th Cir. 1991); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir.

17  1985).  The due process inquiry in federal habeas review is whether the admission of

18  evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.

19  *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990.[3]  Even if an

20  evidentiary error is of constitutional dimension, the court must consider whether the error

21  was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *See Dillard v. Roe*, 244

22  F.3d 758, 767 n.7 (9th Cir. 2001).

23       In *Perry v. New Hampshire*, the United States Supreme Court recently spoke on the

24

25       [3] The Supreme Court "has not yet made a clear ruling that admission of irrelevant or
26  overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance
    of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's
27  admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit
    precedent but not contrary to, or an unreasonable application of, clearly established Federal
28  law under § 2254(d)).

United States District Court

For the Northern District of California

1    admission of eyewitness out-of-court identifications, and reiterated the relevant legal

2    standards as previously set forth by the Court. 132 S.Ct. 716 (2012). Specifically, in *Perry*,

3    the Court ruled that the introduction of eyewitness out-of-court identification testimony,

4    without a preliminary judicial assessment of its reliability, did not render the defendant's trial

5    fundamentally unfair given the safeguards generally applicable in criminal trials. *Id.*

6         In *Perry*, the defendant was convicted in New Hampshire state court of theft after

7    taking items from a car in the parking lot of an apartment building. *Id.* at 721-23. An officer

8    responding to a report that a man was trying to break into cars in the parking lot saw the

9    defendant standing between two cars. *Id.* The defendant walked toward the officer holding

10   two car-stereo amplifiers in his hands, and a metal bat was on the ground behind him. *Id.*

11   An eyewitness, interviewed by police at her apartment, stated that the perpetrator was an

12   African-American man. *Id.* When police asked her for a more specific description of the

13   man, she pointed to her kitchen window and said the man she saw breaking into a car was

14   standing in the parking lot, next to a police officer. *Id.* The defendant's arrest followed this

15   identification. *Id.* About a month later, when police showed the eyewitness a photographic

16   array that included a picture of the defendant, she was unable to identify the defendant as

17   the perpetrator. *Id.* The trial court denied the defendant's motion to suppress the

18   eyewitness' identification on the ground that admitting it would violate due process. The

19   New Hampshire Supreme Court affirmed the defendant's conviction. *Id.*

20        The Supreme Court affirmed, holding that under its precedent, the Due Process

21   Clause does not require a preliminary judicial inquiry into the reliability of eyewitness

22   identification that was not procured under unnecessarily suggestive circumstances

23   arranged by law enforcement. *Id.* at 730. It held that the admission of identification

24   testimony raises due process concerns only when law enforcement officers use an

25   identification procedure that is both suggestive and unnecessary. *Id.* The court

26   acknowledged the *Perry* defendant's arguments regarding the inaccuracy rate for

27   eyewitness identifications generally, but held that when no improper law enforcement

28

                                                     10

United States District Court
For the Northern District of California

1   activity is involved, the reliability of eyewitness testimony can be sufficiently tested through

2   rights and opportunities generally designed for that purpose, notably, the presence of

3   counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence,

4   and jury instructions on both the fallibility of eyewitness identifications and the requirement

5   that guilt be proved beyond a reasonable doubt.  *Id.* at 726.

6       In so holding, the *Perry* court summarized its precedent regarding out-of-court

7   eyewitness identifications to date.  *Id.* at 723-24.  It commenced by noting that, "[t]he

8   Constitution, our decisions indicate, protects a defendant against a conviction based on

9   evidence of questionable reliability, not by prohibiting introduction of the evidence, but by

10  affording the defendant means to persuade the jury that the evidence should be discounted

11  as unworthy of credit."  *Id.* at 723.  The "constitutional safeguards available to defendants

12  to counter the state's evidence include the Sixth Amendment rights to counsel, compulsory

13  process, and confrontation plus cross-examination of witnesses."  *Id.* (citing *Gideon v.*

14  *Wainwright*, 372 U.S. 335, 343–45 (1963); *Taylor v. Illinois*, 484 U.S. 400, 408–09  (1988);

15  *Delaware v. Fensterer*, 474 U.S. 15, 18–20 (1985)).  It is "[o]nly when evidence is so

16  extremely unfair that its admission violates fundamental conceptions of justice, [that the

17  Court has] imposed a constraint tied to the Due Process Clause."  *Id.*

18      The *Perry* Court then synthesized the approach it set forth in prior cases, namely

19  *Neil v. Biggers*, 409 U.S. 188 (1972), and *Manson v. Brathwaite*, 432 U.S. 98 (1977), used

20  to determine whether the Due Process Clause requires suppression of an out-of-court

21  eyewitness identification.  *Id.* at 724.  First, due process concerns arise only when law

22  enforcement officers use an identification procedure that is both suggestive and

23  unnecessary.  *Id.* at 724 (citing *Brathwaite*, 432 U.S. at 107; *Biggers*, 409 U.S. at 198).

24  However, "even when the police use such a procedure,[] suppression of the resulting

25  identification is not the inevitable consequence."  *Id.* (citing *Brathwaite*, 432 U.S. at 112–13;

26  *Biggers*, 409 U.S. at 198–99).  "A rule requiring automatic exclusion []would 'g[o] too far,'

27  for it would 'kee[p] evidence from the jury that is reliable and relevant,' and 'may result, on

28

11

United States District Court

For the Northern District of California

1  occasion, in the guilty going free.'" *Id.* (quoting *Brathwaite*, 432 U.S. at 112) (when an

2  "identification is reliable despite an unnecessarily suggestive [police] identification

3  procedure," automatic exclusion "is a Draconian sanction," one "that may frustrate rather

4  than promote justice").

5      "Instead of mandating a per se exclusionary rule, [] the Due Process Clause requires

6  courts to assess, on a case-by-case basis, whether improper police conduct created a

7  'substantial likelihood of misidentification.'" *Id.* (citing *Biggers*, 409 U.S. at 201).

8  "'[R]eliability [of the eyewitness identification] is the linchpin' of that evaluation." *Id.* (quoting

9  *Brathwaite*, 432 U.S. at 112).  "Where the 'indicators of [a witness'] ability to make an

10  accurate identification' are 'outweighed by the corrupting effect' of law enforcement

11  suggestion, the identification should be suppressed." *Id.* (quoting *Brathwaite*, 432 U.S. at

12  114).  Otherwise, the evidence, if admissible in all other respects, should be submitted to

13  the jury.  *Id.*  The reliability factors to be considered in evaluating a witness' ability to make

14  an accurate identification include: (1) the opportunity of the witness to view the criminal at

15  the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his prior

16  description of the criminal; (4) the level of certainty demonstrated at the confrontation; and

17  (5) the time between the crime and the confrontation.  *Id.* (citing *Brathwaite*, 432 U.S. at

18  114).

19      The *Perry* Court rejected the petitioner's argument that under *Brathwaite*, any time a

20  pretrial eyewitness identification was made under suggestive circumstance, the trial court

21  should be required to screen the identification for reliability.  *Id.* at 725.  Regarding the

22  reliability requirement, the *Perry* Court clarified that:

23      the *Brathwaite* Court's reference to reliability appears in a portion of the
        opinion concerning the appropriate remedy when the police use an
24      unnecessarily suggestive identification procedure. The Court adopted a
        judicial screen for reliability as a course preferable to a per se rule requiring
25      exclusion of identification evidence whenever law enforcement officers
        employ an improper procedure. The due process check for reliability,
26      *Brathwaite* made plain, comes into play only after the defendant establishes
        improper police conduct. The very purpose of the check, the Court noted, was
27      to avoid depriving the jury of identification evidence that is reliable,
        notwithstanding improper police conduct.

28

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Id.* at 725-26 (citing *Brathwaite*, 432 U.S. at 112-13). The *Perry* Court further stated that the reliability or "due process" check is linked "not to suspicion of eyewitness testimony generally, but only to improper police arrangement of the circumstances surrounding an identification." *Id.* (citing *Coleman v. Alabama*, 399 U.S. 1 (1970)).

In terms of reliability, the *Perry* Court suggested that "[e]xternal suggestion [by law enforcment] is hardly the only factor that casts doubt on the trustworthiness of an eyewitness' testimony." *Id.* at 727. It noted that "many other factors bear on 'the likelihood of misidentification,' [] for example, the passage of time between exposure to and identification of the defendant, whether the witness was under stress when he first encountered the suspect, how much time the witness had to observe the suspect, how far the witness was from the suspect, whether the suspect carried a weapon, and the race of the suspect and the witness." *Id.*

C.   **Parties' Arguments**

1.   **Standing**

Regarding standing, Figueroa contends that the state court's determination that he lacked standing was contrary to federal law, suggesting that he has standing to object to the admission of unreliable evidence used to his detriment. In opposition, the state argues that Figueroa lacked standing to complain about an alleged infringement of Sanchez's constitutional rights, but acknowledges that Figueroa has standing in these proceedings to object that the trial court's admission of Ms. Cobos' identification rendered his trial fundamentally unfair so as to violate due process.

2.   **Merits**

As for the merits, Figueroa argues that the state court's decision was contrary to federal law because although the state court properly set out the two step-approach it was required to apply, it unreasonably applied it. Figueroa argues that the state court improperly conflated the suggestiveness and reliability prongs into a single analysis. He contends that the state court's conflation of the two standards was per se unreasonable

1    and prejudicial and entitles him to federal habeas relief.

2                    **a.    Suggestiveness**

3        To the extent that the state court held that the identification was not unduly

4    suggestive, Figueroa argues the decision was unreasonable.  He contends that Sanchez's

5    photo was singled out and emphasized in a manner that clearly distinguished it from the

6    others presented to Ms. Cobos.  In support, he asserts that unlike the other photos,

7    Sanchez's was standing alone and of a larger size, the photo included information clearly

8    identifying Sanchez as an arrestee with an alias, the photo was taken from a different angle

9    than the other photos with Sanchez looking up at the camera, and it was presented only

10   after Ms. Cobos was unable to identify the shooter from the other sets of photographs.

11   Figueroa further implies that Nolan's failure to record the procedure supports its

12   suggestiveness.

13       Figueroa additionally argues that it was unnecessary for Nolan to utilize the

14   procedure that he did, and that he had no good explanation for his presenting Sanchez's

15   single photo, or for his failure to prevent Ms. Cobos from observing the written information

16   on Sanchez's photo.

17       Regarding suggestiveness, in addition to arguing that the state court unreasonably

18   applied federal law, Figueroa also argues that the California Court of Appeal unreasonably

19   determined certain facts in light of the evidence presented in the state court proceeding

20   under § 2254(d)(2).  Specifically, Figueroa argues that the state court's assertion that

21   "Nolan instructed Cobos not to guess or conclude anything from the fact that he was

22   showing her the photographs" was an unreasonable determination of the facts.  He argues

23   that instead, Nolan advised Ms. Cobos that "she should not conclude anything from the fact

24   that a particular person's photo appeared in the photos he was showing her."  Figueroa

25   contends that this evidence differs from the state court's determination of the facts because

26            Ms. Cobos would have understood from the latter only that she should not
             think that, simply because a photo was included, the depicted individual was
27            a suspect, an arrestee, a bad guy, etc. . . ., an admonition that was
             completely vitiated in any event once she saw Sanchez's booking date.

28

                                          14

1    Regardless, and again, that admonition was *not* the equivalent of telling her
2    that she was not obligated to pick a photo and that the suspect may not be
     included.

3    Opening Brief at 37.

4         In its response, contrary to Figueroa, the state assumes that the state court indeed

5    addressed suggestiveness, and argues that its conclusion that the procedure was not

6    unduly suggestive was not unreasonable.  It asserts that this was not a case where

7    Sanchez's photo was in color where the others were in black and white; nor was it more

8    menacing than the other photos.  It points out that Ms. Cobos was admonished not to

9    guess or conclude anything based on the fact that she was being shown the photos, and

10   notes that Ms. Cobos viewed eighteen other photographs before identifying Sanchez's

11   photograph.

12        In his traverse, Figueroa argues that the procedure here did constitute the functional

13   equivalent of a "one-picture show-up" and was unduly suggestive for that reason.

14   However, he contends that even if that was not the case, it was nevertheless unduly

15   suggestive because it was distinctive from the other photographs shown in groups of six.

16   In support, Figueroa makes several arguments, some of which more appropriately apply to

17   reliability rather than to suggestiveness, and are included with the discussion regarding

18   reliability below.

19        Figueroa contends that the procedure was unduly suggestive because Nolan

20   presented the photo alone to Ms. Cobos after she failed to pick out the shooter from the

21   other photos, because it alone "depicted an arrestee with an alias," and because it was

22   larger than the other photos and emphasized Sanchez's eyes.

23        Figueroa also suggests that the state court unreasonably relied on the fact that

24   Nolan allegedly did not know Sanchez was the shooter at the time he showed Ms. Cobos

25   the photo.  See Traverse at 9 ("the state appellate court asked and answered the wrong

26   question - did Officer Nolan know that Sanchez was the shooter when he showed the

27   latter's photo to Ms. Cobos. . . ?"). Instead, Figueroa contends that Nolan "almost certainly"

28

1    showed Ms. Cobos Sanchez's single photo because he knew Sanchez was a deceased

2    member of the Border Brother's street gang.

3          Additionally, citing to a United States Department of Justice training manual,

4    Figueroa argues that the California Appellate Court should have addressed Nolan's failure

5    to advise Ms. Cobos that the shooter may not be in the line-up at all.

6          **b.    Reliability**

7          Figueroa also suggests that to the extent the state court concluded that the

8    identification was reliable, it unreasonably applied federal law.  He argues that the following

9    factors made the identification unreliable:

10         (1) Ms. Cobos was asked to make the identification nearly nine months after the
11    shooting;

12         (2) Nolan failed to admonish Ms. Cobos that the suspect may not have been
     included in the photographs she was shown;

13         (3) Ms. Cobos observed the shooter under very stressful conditions given that her
14    husband had just warned her to get down, and the stress may have distorted her
     perceptions;

15         (4) the duration for which Ms. Cobos observed the shooter was short, and to the
16    extent she testified otherwise, she exaggerated the duration;

17         (5) there was no corroborating evidence at trial that Sanchez was the shooter;

18         (6) Ms. Cobos' observation of the gun's "flashes" in the shooter's hands impaired
     her ability to accurately identify the shooter's face;

19         (7) Ms. Cobos was a civilian with no special training in observation and reporting;

20         (8) Ms. Cobos did not concentrate her full attention on the shooter, but looked
21    away to see what he was shooting at;

22         (9) the shooter was a stranger to Ms. Cobos;

23         (10) Ms. Cobos testified that she was shown the photos in June 2007, when she
     was actually shown them on May 24, 2007, suggesting a general failure in memory;

24         (11) Ms. Cobos' view through the rolled up passenger door window of her vehicle
25    could have been obstructed;

26         (12) Ms. Cobos did not appear initially certain regarding her identification of
     Sanchez; and

27         (13) Ms. Cobos' prior description of the shooter did not match Sanchez because
     she had previously described him as clean-shaven.

28

16

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Of the above factual arguments, Figueroa makes a § 2254(d)(2) argument solely with respect to the state court's finding that Ms. Cobos "was not under the stress of being the target of the crime." He argues that this state court finding was unreasonable.

In opposition, citing to the five factors set forth by the United States Supreme Court in *Brathwaite*, the state argues that Ms. Cobos' identification was reliable. *See* 432 U.S. at 114 (the factors for evaluating reliability include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation). Regarding the first factor, the state argues that Ms. Cobos had a clear view of the shooter and that there were no obstructions to her view. Second, the state contends that Ms. Cobos' degree of attention was high, given that she watched the shooter's face for the entire shooting, and focused on him because of the "cold" look in his eyes. Third, regarding the accuracy of prior descriptions, the state asserts Ms. Cobos recognized Sanchez as a clean-shaven Latino man in his late teens or early twenties and identified his clothing. As for the fourth and fifth factors, the state notes that even though eight to nine months elapsed between the shooting and the photographic line-up, Ms. Cobos was "absolutely certain" when she saw Sanchez's photo that she was looking at the shooter.

The state further refutes Figueroa's laundry list of factors. It argues that the state court's determination that Ms. Cobos' identification was reliable was a not an unreasonable application of federal law. It does not specifically address Figueroa's argument regarding the state appellate court's factual findings under § 2254(d)(2).

In his traverse, Figueroa again contests several of the facts set forth by the state regarding Ms. Cobos' testimony and identification (many of which constitute state appellate court factual findings), and argues that Ms. Cobos' testimony was not credible. Figueroa again makes several arguments regarding the unreliability of eyewitness identifications generally based on social science research, law enforcement training manuals, and other

1  similar sources.

2  **D.  Analysis**

3  **1.  Supplemental Evidence Attached to Federal Habeas Brief**

4  Figueroa stapled several "exhibits" to his federal habeas petition.  Exhibits A and B

5  represent state court orders that are already a part of this court's record, so there is no

6  issue regarding this court's ability to review and consider those orders in the context of this

7  federal habeas petition.

8  However, according to Figueroa, Exhibit C represents a copy of the photo line-ups

9  shown to Ms. Cobos.  The state did not object to the "exhibit;" nevertheless, this court

10 notes that it is not permitted to simply consider evidence stapled to habeas petitions, and in

11 order to consider such evidence in the context of this petition, the evidence must have been

12 included in the record before the state appellate courts.  Initially, it was unclear to the court

13 whether the photos had been presented to and considered by the state appellate courts.

14 The California Court of Appeal's decision suggested that it likely had reviewed the

15 photographs, but the habeas record submitted by respondent before this court did not

16 appear to contain copies of the photo line-ups; nor did the parties cite to the record in their

17 briefs when they referred to the line-ups.  However, the state has since submitted

18 petitioner's state appellate court briefs in response to this court's June 25, 2012 order

19 requiring the state to supplement the record.  Figueroa's brief submitted to the California

20 Court of Appeal confirms that the photo line-up was indeed before that court, and therefore

21 may be considered by this court on federal habeas review.  *See* Appellant's Opening Br. at

22 15.

23 **2.  General Observations**

24 At the outset, the court notes that as indicated above, throughout his briefs,

25 Figueroa frequently argues that the California Court of Appeal's findings and

26 characterizations of the record evidence were erroneous.  In many instances, he implies

27 that in evaluating his claim, this court should simply adopt his interpretation of the evidence

28

United States District Court

For the Northern District of California

1   and the record, even when it is contrary to the state court's determinations otherwise.

2   That, however, is not this court's role on federal habeas review.

3        As set forth above, habeas relief is warranted only if the California Court of Appeal's

4   decision "was based on an unreasonable determination of the facts in light of the evidence

5   presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  The relevant question

6   under § 2254(d)(2) is whether an appellate panel, applying the normal standards of

7   appellate review, could reasonably conclude that the state court findings are supported by

8   the record.  *Detrich v. Ryan*, 677 F.3d 958, 972 (9th Cir. 2012); *Lambert v. Blodgett*, 393

9   F.3d 943, 978 (9th Cir. 2004).  Factual issues are defined as "basic, primary, or historical

10  facts: facts in the sense of a recital of external events and the credibility of their narrators."

11  *Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000).

12       Intrinsic challenges to state court findings pursuant to the "unreasonable

13  determination" standard may arise in several ways, including where the finding is

14  unsupported by sufficient evidence; where the state court should have made a finding of

15  fact but neglected to do so; where the state court made findings of fact under a

16  misapprehension of the correct legal standard; and where the fact-finding process itself

17  was defective.  *See Taylor v. Maddox*, 366 F.3d 992, 999, 1000–01 (9th Cir. 2004).

18  Where a petitioner challenges the state court's findings based entirely on the state record,

19  "[the court] must be particularly deferential to [the] state court [ ]," and defer to its factual

20  findings unless it is "convinced that an appellate panel, applying the normal standards of

21  appellate review, could not reasonably conclude that the finding is supported by the

22  record." *Maxwell v. Roe*, 628 F.3d 486, 500 (9th Cir. 2010) (*quoting Maddox*, 366 F.3d at

23  999–1000). "This is a daunting standard - one that will be satisfied in relatively few cases."

24  *Id*; *see, e.g., De Weaver v. Runnels*, 556 F.3d 995, 1006–07 (9th Cir. 2009) (petitioner did

25  not show unreasonable determination of facts by merely disagreeing with the state court's

26  interpretation of the record but not pointing to any material fact that the court failed to

27  consider in reaching its determination that the trial judge had not coerced the jury to reach

28

a verdict); *cf. Detrich*, 677 F.3d at 981 (quoting *Maddox*, 366 F.3d at 1001) ("a state court unreasonably determines the facts when it "overlook[s] or ignore[s] evidence [that is] highly probative and central to petitioner's claim").

A federal district court must accord a state court's credibility determination the highest deference. *See Knaubert v. Goldsmith*, 791 F.2d 722, 727 (9th Cir. 1985). A state court's rejection of a claim following a hearing or trial at which directly contradictory statements are offered constitutes an implied credibility determination by the state court that is entitled to deference under § 2254(d)(2). *See Weaver v. Palmateer*, 455 F.3d 958, 963 n. 6 (9th Cir. 2006).

The court has applied the above standards in evaluating Figueroa's arguments that constitute challenges to state appellate court findings.

Additionally, the court notes that, in support of his claims, Figueroa cites and relies in many places in his briefs on social science articles and research and law enforcement "guidance" regarding eyewitness identifications. As this is a federal habeas case, this authority is not particularly helpful - or authoritative - since none of it constitutes clearly established federal law as determined by the United States Supreme Court.

### 3.      State Court Decisions

In admitting Cobos' pretrial identification of Sanchez, the state trial court expressly found that the procedure was not unnecessarily suggestive but did not make an express ultimate finding regarding reliability. However, many of the findings the trial court made were more appropriate to a reliability determination - as opposed to a suggestiveness determination - including those regarding Ms. Cobos' opportunity to view the shooter; her focus on the shooter; her level of certainty in her identification; and the time that elapsed between the shooting and the identification. Accordingly, it is fair to conclude that the state trial court determined that the procedure was neither unduly suggestive nor unreliable.

Subsequently, in affirming the trial court, the California Court of Appeal set forth the proper legal standards, and noted the two different inquiries - suggestiveness and reliability

- in evaluating the identification.  Figueroa is correct that in its analysis of the issues, the

appellate court combined its discussion of the two inquiries - suggestiveness and reliability

- into the same paragraph.  However, the state court in fact addressed both the

suggestiveness and the reliability issues in that paragraph.

As for suggestiveness, the court held:

the identification procedure used here, while certainly no model of good police practice, was not the functional equivalent of a one picture show-up, as defendant claims. Sergeant Nolan admonished Cobos not to guess or conclude anything from the fact that he was showing her the photographs, and there was no evidence he showed her Sanchez's photograph separately because the police believed he was the shooter Cobos had seen.  Cobos looked at 18 photographs before she got to Sanchez's, with no sign that she recognized anyone.

Additionally, regarding reliability, the court held:

In our view, Cobos's identification of Sanchez was reliable under the totality of the circumstances. She had an unobstructed view of the shooter's face in broad daylight. Due to the deliberate manner in which the shooter went about his business, she could see his face for more than a few seconds. Her attention was focused on the shooter's face because of the unusual look he had in his eyes. She was not under the stress of being the target of the crime.

. . . .

When shown Sanchez's photograph, she reacted immediately and expressed a high degree of certainty that he was the shooter. Given the totality of the circumstances, we find no substantial likelihood that Cobos's reaction was caused by the size of the photograph or the manner in which it was presented to her.

Accordingly, the state appellate court set forth the proper legal standards and

addressed the considerations governing both suggestiveness and reliability.  This court

rejects Figueroa's argument that he is entitled to habeas relief based on the simple fact that

it combined its discussion of the two issues in its analysis.

### 4.   Standing

The state court's standing determination was based on state law.  It is not disputed

that on federal habeas review, Figueroa may challenge on due process grounds the trial

court's admission of evidence.  Accordingly, the court need not reach the issue regarding

whether the state court's standing ruling was unreasonable under AEDPA given that there

1   is no dispute that Figueroa is entitled to challenge the admission of the evidence in these

2   proceedings.

3       **5.   Merits**

4           **a.   Suggestiveness**

5                **i.   Factual Findings**

6       As noted, in support of his argument that the procedure used by Nolan was unduly

7   suggestive, Figueroa explicitly challenges one related finding of the California Court of

8   Appeal, and in argument also implicitly challenges at least two other factual issues

9   addressed by the state appellate court.  First, as noted, Figueroa argues that the state

10  court's finding that "Nolan instructed Cobos not to guess or conclude anything from the fact

11  that he was showing her the photographs" was an unreasonable determination of the facts.

12      This court disagrees that the state court's finding constituted an unreasonable

13  determination of the facts in light of the evidence.  Having reviewed the record, the state

14  court's finding is nearly identical to Nolan's testimony on the subject.  Nolan testified that he

15  advised Ms. Cobos that "she was about to look at a group of photographs, to not guess or

16  conclude anything from the fact [he] was showing her the photographs."  R.T. 32-33.  Nolan

17  further advised Ms. Cobos "that people's complexion[s] could appear different in the

18  photograph[s], as well as hairstyles and facial hair could change."  R.T. 33.

19      Additionally, Figueroa suggests several times in his briefs that Ms. Cobos actually

20  observed the information contained on the bottom of Sanchez's photo, which as the

21  California Court of Appeal noted, contained "Sanchez's 'PFN' number (a unique number

22  assigned to arrestees), his first and last names, a booking date in 2002, and Sanchez's

23  nickname, 'Lechuga.'"  Not only does Figueroa assume that Ms. Cobos in fact observed

24  this information, but he also assumes that she recognized the information for what it was:

25  a booking date, the fact that he was an arrestee, and also that he possessed an alias.  This

26  simply is not borne out by the record in this case.  Instead, the California Court of Appeal

27  correctly and reasonably found that "[w]hen Cobos first saw the photograph, the writing was

28

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1    covered with another piece of paper. Nolan testified that Cobos nonetheless *might have*

2    been able to see the writing when she picked the page up to take a closer look at the

3    photograph." (Emphasis added.) Based on the court's review of the record, this finding

4    was reasonable, and it is unclear whether Ms. Cobos actually observed any of the

5    notations on Sanchez's photo, and it is equally unclear whether or if she understood the

6    significance of the writing.

7         Finally, Figueroa mistakenly asserts that the state appellate court unreasonably

8    found that Nolan did not know Sanchez was the shooter at the time he showed Ms. Cobos

9    the photo. See Traverse at 9 ("the state appellate court asked and answered the wrong

10   question - did Officer Nolan know that Sanchez was the shooter when he showed the

11   latter's photo to Ms. Cobos. . . ?"). This, however, is a mischaracterization of the state

12   court's decision. The state court decision did *not* focus on that fact, nor did it make such a

13   finding. In fact, the court touched upon the issue, if at all, tangentially at best. *See*

14   Decision at 6 ("there was no evidence [Nolan] showed her Sanchez's photograph

15   separately because the police believed he was the shooter Cobos had seen").

16                    **ii.    Legal Conclusions and Conclusions of Mixed Law and Fact**

17        While this court agrees with the California Court of Appeal that the photo

18   identification procedure utilized here was "no model of good police practice," it cannot

19   conclude that the state court's determination that the procedure was not unduly suggestive

20   was unreasonable or contrary to federal law *as established by the United States Supreme*

21   *Court.* An identification procedure is suggestive where it "[i]n effect ... sa[ys] to the witness

22   'This is the man.'" *Foster v. California*, 394 U.S. 440, 443 (1969). In *Foster*, the Supreme

23   Court found the identification procedure in that case impermissibly suggestive because: (1)

24   the defendant stood out markedly from other photographic lineup participants (with respect

25   to the suspect's identifying features, such as height and skin tone); (2) the defendant was

26   the only person who appeared in each of the two lineups the police showed the witness;

27   and (3) the police subsequently permitted a one-to-one confrontation between the

28

1    defendant and the witness.  *Id.*

2        In *United States v. Wade*, the Supreme Court similarly noted numerous instances of

3    suggestive procedures, for example, that all persons in the lineup but the suspect were

4    known to the identifying witness; that the other participants in a lineup were grossly

5    dissimilar in appearance to the suspect; that only the suspect was required to wear

6    distinctive clothing which the culprit allegedly wore; that the witness was told by the police

7    that they had caught the culprit after which the defendant was brought before the witness

8    alone or was viewed in jail; that the suspect was pointed out before or during a lineup; and

9    that the participants in the lineup were asked to try on an article of clothing which fits only

10   the suspect.  388 U.S. 218, 239–41 (1967) (finding unconstitutional an identification that

11   occurred without defendant's counsel present).

12       Here, the photo of Sanchez was not markedly different from the other eighteen

13   photos shown to Ms. Cobos.  All of the subjects in the photos appear to be Latino, of

14   similar complexion and with similar facial hair, and of a similar age to Sanchez.  Sanchez's

15   photo differed from the others in that it was a single photo, not included on a page with six

16   other photos, and it contained notations, which Ms. Cobos may or may not have observed.

17   However, these factors, and, specifically, the totality of the procedure employed by Nolan,

18   are nowhere near as suggestive as those cases in which the United States Supreme Court

19   has held pretrial identifications to be unduly suggestive - or even many cases in which the

20   identifications were found *not* to be unduly suggestive.  *See, e.g., Stovall v. Denno,* 388

21   U.S. 293, 302 (1967)*, overruled on other grounds by Griffith v. Kentucky,* 479 U.S. 314

22   (1987) (finding constitutional an identification where the suspect was handcuffed to a police

23   officer, escorted by four other police officers, and was brought to the hospital bed of his

24   victim who was asked whether the suspect "was the man"); *see also Mitchell v. Goldsmith*,

25   878 F.2d 319, 323 (9th Cir. 1989) (lineup not unduly suggestive where petitioner was only

26   person in the lineup photographed against blue background; four of seven individuals in

27   lineup had lighter complexions than his; and photo was only photo with a 1981 date).

28

1   Accordingly, the procedure employed by Nolan was not unduly suggestive under clearly

2   established United States Supreme Court law.

3                     **b.      Reliability**

4        Nevertheless, even if the procedure utilized by Nolan may be considered unduly

5   suggestive, the California Court of Appeal's determination that the identification was

6   reliable was not unreasonable or contrary to clearly established United States Supreme

7   Court law.

8                     **i.      Factual Findings**

9        As with suggestiveness, Figueroa explicitly challenges one related finding of the

10  California Court of Appeal, and in argument also challenges numerous other related factual

11  issues addressed by the state appellate court.  Again, many of the "facts," presented by

12  Figueroa in support of his argument regarding reliability constitute his interpretation of the

13  evidence, about which the state appellate court made contrary findings.  Figueroa, in many

14  instances, asks this court to simply disregard the state appellate court's findings and/or to

15  make findings that simply are not supported by the record in this case.

16       Among the "facts" related to reliability advanced by Figueroa that are disputed,

17  unsupported, and/or contrary to the state court findings are his assertions that:

18                    **(1)     Ms. Cobos observed the shooter under very stressful**

19                              **conditions.**

20       Contrary to the California Court of Appeal's finding that Ms. Cobos "was not under

21  the stress of being the target of the crime," Figueroa argues that given that her husband

22  had just warned her to get down, the stress may have distorted her perceptions.  He

23  contends that the court's finding was unsupportable under § 2254(d)(2).  Figueroa also

24  points to Ms. Cobos' testimony that after the shooting stopped, she remained "nervous"

25  and "upset."

26       Having reviewed the record, the court concludes that the state court's finding did not

27  constitute an unreasonable determination in light of the evidence, especially Ms. Cobos'

28

**United States District Court**
For the Northern District of California

1   testimony at trial.  There was nothing in her testimony that suggested that Ms. Cobos

2   thought she was a target of the crime or that her perception of the shooter was distorted by

3   the stress of the situation and Figueroa's assertion to the contrary amounts to no more than

4   speculation.  Accordingly, the court affords deference to the state court's finding and rejects

5   Figueroa's factual assertion to the extent that it conflicts that finding.

6                   **(2)**      **The duration for which Ms. Cobos observed the**

7                                     **shooter was short, and to the extent she testified**

8                                     **otherwise, she exaggerated the duration.**

9         Here, Figueroa does not explicitly argue that the state court's finding that Ms. Cobos

10   could see the shooter's face for "more than a few seconds" was an unreasonable

11   determination of the evidence, but that is the implication.  Having reviewed the record, the

12   court concludes that this determination was reasonable.  Moreover, to the extent that

13   Figueroa is arguing Ms. Cobos' testimony was not credible, credibility was a decision for

14   the factfinder - not this court on federal habeas review.

15                   **(3)**      **Ms. Cobos' observation of the gun's "flashes" in the**

16                                     **shooter's hands impaired her ability to accurately**

17                                     **identify the shooter's face.**

18         The above assertion is contrary to state appellate court findings and to Ms. Cobos'

19   testimony at trial.  Specifically, it contradicts the state court's findings that Ms. Cobos "had

20   an unobstructed view of the shooter's face in broad daylight;" that "she could see [the

21   shooter's] face for more than a few seconds;" that "[h]er attention was focused on the

22   shooter's face;" and that when shown the photo of Sanchez she "immediately" "expressed

23   a high degree of certainty that he was the shooter."

24         Again, having reviewed the record, the court concludes that the state court's findings

25   did not constitute an unreasonable determination of the facts in light of the evidence.  Ms.

26   Cobos repeatedly testified that she was focused on the shooter's face, and there was no

27   evidence that the gun "flashes" she testified she observed impeded her ability to identify the

28

shooter.

> **(4)** **Ms. Cobos did not concentrate her full attention on the shooter, but looked away to see what he was shooting at.**

Figueroa's interpretation of the evidence is not only contrary to the state court findings, but it is also speculative and unsupported by the evidence.  For the same reasons as those set forth above with respect to (3), the court concludes that the state court's findings did not constitute an unreasonable determination of the facts in light of the evidence at trial.

> **(5)** **Ms. Cobos' view through the rolled up passenger door window of her vehicle could have been obstructed.**

Yet again, Figueroa's interpretation of the evidence is not only contrary to the state court findings, but it is also speculative and unsupported by the evidence.  For the same reasons as those set forth above with respect to (3), the court concludes that the state court's findings did not constitute an unreasonable determination of the facts in light of the evidence at trial.

> **(6)** **Ms. Cobos did not appear initially certain regarding her identification of Sanchez.**

Figueroa's interpretation of the evidence is not only contrary to the state court findings, but it is also speculative and unsupported by the evidence.  This interpretation contradicts the California Court of Appeal's finding that when shown the photo of Sanchez Ms. Cobos, "immediately" "expressed a high degree of certainty that he was the shooter." It also contradicts testimony in the record from Ms. Cobos and Nolan.

Having reviewed the record, the court concludes that the state court's finding did not constitute an unreasonable determination in light of the evidence.  Accordingly, the court affords deference to the state court's finding and rejects Figueroa's factual assertion to the

United States District Court

For the Northern District of California

1    extent that it conflicts with that finding.

2        **(7)    Ms. Cobos' prior description of the shooter did not**

3            **match Sanchez because she had described him as**

4            **clean-shaven.**

5        This assertion is not so much a challenge to the state court's explicit findings as it is

6    a mischaracterization of the record.  It is undisputed that Ms. Cobos had identified the

7    shooter as clean-shaven at the time of the shooting.  It is also undisputed that Ms. Cobos

8    identified the shooter in the photo nearly nine months after the shooting, and that, in the

9    photo, Sanchez, had facial hair.  Given the passage of time between the shooting and the

10   photo line-up, the discrepancy in facial hair does not support a conclusion that Ms. Cobos

11   gave a prior description of the shooter that did not match Sanchez.

12            **ii.    Legal Conclusions and Conclusions of Mixed Law and Fact**

13       As noted above, the reliability factors to be considered in evaluating a witness' ability

14   to make an accurate identification include: (1) the opportunity of the witness to view the

15   criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his

16   prior description of the criminal; (4) the level of certainty demonstrated at the confrontation;

17   and (5) the time between the crime and the confrontation.  *Perry*, 132 S.Ct. at 723 (citing

18   *Brathwaite*, 432 U.S. at 114).

19       Consideration of the relevant factors confirms that the state court's determination

20   that Ms. Cobos' pretrial identification of Sanchez was reliable was not unreasonable or

21   contrary to federal law as established by the United States Supreme Court.  Ms. Cobos had

22   sufficient opportunity to identify the shooter at the time of the crime and she afforded a high

23   degree of attention to the shooter, especially his face.  For the reasons set forth above, her

24   prior description of the shooter was not contrary to her subsequent identification, and she

25   relayed a high degree of certainty that Sanchez was the shooter.  Accordingly, the only

26   factor that weighs against reliability is the delay in time - nearly nine months - that elapsed

27   between the shooting and Ms. Cobos' identification at the photo line-up.  Given that the

28

**United States District Court**
For the Northern District of California

1   majority of factors overwhelmingly support reliability, Figueroa is not entitled to relief on this

2   claim.

3       **c.       Prejudice**

4       Because the court concludes that the admission of Ms. Cobos' pretrial identification

5   of Sanchez did not violate Figueroa's due process rights, it need not address whether

6   admission of the evidence was prejudicial.

7                                   **CONCLUSION**

8       For the foregoing reasons, Figueroa's petition for a writ of habeas corpus is

9   **DENIED**.  The clerk shall close the file.

10                          **CERTIFICATE OF APPEALABILITY**

11      To obtain a COA, Figueroa must make "a substantial showing of the denial of a

12  constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the

13  constitutional claims on the merits, the showing required to satisfy § 2253(c) is

14  straightforward.  "The petitioner must demonstrate that reasonable jurists would find the

15  district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

16  *McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a

17  COA to indicate which issues satisfy the COA standard.  Here, the court finds that the issue

18  presented by Figueroa in his petition meets the above standard and accordingly GRANTS

19  the COA as to that issue.  *See generally Miller-E v. Cockrell I*, 537 U.S. at 322. That issue

20  is:

21      (1) his Fourteenth Amendment due process rights were violated when the trial court

22  admitted into evidence an eyewitness identification of the person whom Figueroa aided and

23  abetted in committing the murder because the identification was the product of an

24  unnecessarily suggestive and unreliable identification procedure.

25  ////

26  ////

27  ////

28

Accordingly, the clerk shall forward the file, including a copy of this order, to the Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

**IT IS SO ORDERED.**

Dated: July 23, 2012

_____
PHYLLIS J. HAMILTON
United States District Judge